**Linda GARDNER, Appellant**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA.**

No. 06–5203.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Aug. 3, 2009.

Opinion Filed: Dec. 4, 2009.

Before: SCIRICA, Chief Judge, CHAGARES and WEIS, Circuit Judges.

OPINION

PER CURIAM.

*Pro se* appellant Linda Gardner challenges the District Court's grant of summary judgment on behalf of Unum Life Insurance Company ("Unum").[1] For the following reasons, we will vacate the District Court's judgment and remand for further proceedings.

**I.**

In July 2001, Gardner stopped working as an operating room nurse at Thomas Jefferson Hospital after she was diagnosed with avascular necrosis ("AVN") in both knees. AVN is a progressive disease that results "from the temporary or permanent loss of the blood supply to the bones. Without blood, the bone tissue dies and causes the bone to collapse. If the process involves the bones near a joint, it often leads to collapse of the joint surface." (SA

---

1. Gardner's *pro se* brief in this appeal contests the District Court's denial of her motion for reconsideration, which was docketed in the District Court after she filed her notice of appeal from the summary judgment order. Because Gardner did not file a new or amended notice of appeal within thirty days after the District Court entered the order denying the motion for reconsideration, we review the summary judgment decision only. *See* Fed. R.App. P. 4(a)(4)(B)(ii); *U.S. v. McGlory,* 202 F.3d 664, 668 (3d Cir.2000).

at 660.) In the early stages of AVN, pain develops gradually, and if the disease progresses to the stage where the bone and joint surface collapse, "[p]ain may be severe enough to limit the patient's range of motion in the affected joint." (SA–662.) The treatment of choice for "for late-stage [AVN] and when the joint is destroyed" is total joint replacement. (*Id.* at 665.)

The month after Gardner was diagnosed with AVN, she underwent bilateral knee replacement surgery and began collecting short term disability payments through her policy with defendant Unum. The first surgery was not, however, successful, and Gardner underwent a second procedure on both knees in February 2002.

Unum approved Gardner's claim for long-term disability benefits by letter dated February 18, 2002. The Policy's definition of "disability," however, changes after the employee has received benefits for 24 months, in this case March 2004. At that point, the employee is considered "disabled when Unum determines that due to the same sickness or injury, [she is] unable to perform the duties of any **gainful occupation** for which [she is] reasonably fitted by education, training, or experience." (*Id.* at 73.)

The policy's glossary defines gainful occupation as follows: "**GAINFUL OCCUPATION** means an occupation that is or can be expected to provide you with income at least equal to your gross disability payment within 12 months of your return to work." (*Id.* at 93).

Several other definitions also are relevant. The glossary defines "gross disability payment" as "the benefit amount before Unum subtracts deductible sources of income and disability earnings." (*Id.* at 94.) "Disability earnings" is defined as "the earnings which you receive while you are disabled and working, plus the earnings you could receive if you were working to your maximum capacity." (*Id.* at 93.)

Long-term disability, maximum capacity, "means, based on your restrictions and limitations: ... beyond 24 months of disability, the greatest extent of work you are able to do in any occupation, that is reasonable available, for which you are reasonably fitted by education, training or experience." (*Id.* at 94–95).

The medical history during the initial uncontested two year period of disability is relevant.

After her second surgery, Gardner was treated for pain management, and in June 2002, after complaining of pain in her ankles, Dr. Roy Friedenthal, her orthopedic surgeon, advised her to have another MRI and x-ray. Dr. Friedenthal reviewed the films, which showed "an irregularity" and a "discontinuity in the joint surface." (*Id.* at 277.) He further noted that the MRI "show[ed] a large lesion in the distal tibia as well as a defect in the dome of the talus." (*Id.*)

In November 2002, Gardner began working part-time at a facility located near her home. (*Id.* at 240.) In an April 2003 statement submitted to Unum, she explained that she had "found a surgical center that will let me come in for a couple of hours once in a while to do lunch relief as an RN. It is on a per diem basis, so they call me when they need me. I have no set hours per week and some weeks I don't work at all, sometimes 3–4 weeks in a row." (*Id.* at 291.) Gardner stated that she could not work two days in a row and that after working she could do nothing but sit with her legs up. She nevertheless preferred to work because it helped her state of mind. (*Id.* at 296.) As to her day-to-day activities, Gardner cared for herself but spent most of the time "sitting or lying on the sofa watching TV. [She could] go out for an hour or two to do [her] shopping ..., but then [she had] to sit down with

[her] legs up for a while after that." (*Id.* at 291.)

Dr. Friedenthal completed Unum's attending physician statement and attached it to Gardner's April 2003 letter. He described her symptoms as unchanged, but noted that she now had AVN of the ankles. He then explained that although he had released her to work in her "own occupation," she could work no "more than 10 hours a week," and indicated that her current functional abilities were "3–4 hours" of sedentary activity "every other day." (*Id.* at 293–95.) Dr. Friedenthal believed that these abilities would not change. (*Id.*)

In response to Unum's request to clarify functional status for full-time sedentary work capacity, Dr. Friedenthal submitted a letter, on July 16, 2003, stating that Gardner:

> "has reached maximum recovery with significant persistent symptoms primarily at the left knee with loss of flexion to 85 [degrees] and chronic pain with motion without instability. She has chronic pain in both ankles and prior workup has revealed [AVN] on the right. These conditions impair her ability to stand and walk even occasionally throughout a workday. She has achieved a level of activity that allows her to work for 10 hours a week and this appears to be at a maximum level. I do not anticipate any significant change in her clinical status, and, therefore, do not anticipate a significant change in her ability to be gainfully employed.
>
> Her condition in her ankles may worsen with time and the status of her knees may also worsen with time and may contribute to an increased level of disability in the future."

(*Id.* at 335.)

In November 2003, Gardner told Unum that there had been no change in her status, and that she had not recently seen Dr. Friedenthal because there was nothing more that he could do to help her. (*Id.* at 365.) Unum sought the opinion of Bethany Washburn, R.N., and asked her to review Gardner's file to evaluate her "expected long term prognosis." (*Id.* at 366.) Washburn concluded that it was "not clear what is preventing an increase in function over time, if current function is being tolerated." (*Id.*) Unum also requested that its vocational consultant, Deede DeLay, review Gardner's file to determine whether she "would be able to perform gainful occ[upation] if she had a full-time sedentary capacity." (*Id.* at 369.) DeLay conducted a transferable skills analysis and identified several sedentary occupations for which she believed Gardner would be qualified. (*Id.* at 371.) A second analysis identified nursing occupations providing a gainful wage. (*Id.* at 376.)

On January 29, 2004, in a telephone call from Unum, Gardner described her pain as constant and reported that it increased with activity. She said that she mostly sits on the sofa with her feet elevated and that she could do some housework if she took breaks but that nearly everything caused her pain. (*Id.* at 390–91.) She also stated that nothing seemed to work for the pain except for narcotics, which doctors would not prescribe to her. (*Id.*)

On February 12, 2004, nurse consultant Kathy Pepin reported to Unum that:

> "[b]ased on the medical history of [Gardner's] conditions and surgical history, it appears that working 10 hours a week is her maximum level of activities. It appears that [Gardner] has pushed herself to do this capacity, even in pain. [Gardner] does have pathology of ankle AVN, for which standing and walking would cause pain and increased swelling. Will discuss with UPMP his analysis of the provided information."

(*Id.* at 401.)

After receiving Pepin's report, Unum asked physiatrist consultant Barry Gen-

dron, D.O., to "comment on [Pepin's] analysis and conclusion." (*Id.* at 402.) Gendron notified the company that Dr. Friedenthal had not responded to a previous inquiry as to "why the claimant does not have greater sedentary capacity" and stated that he would contact him for clarification. (*Id.*)

On February 17, 2004, Unum wrote to Gardner that "[a] review has now been completed by our medical department. Based upon our review, it remains unclear why you would not have greater than 10 hours per week sedentary work capacity. So that we may better understand your current level of functionality, we are writing to Dr. Friedenthal." (*Id.* at 410–11.)

The next day, Dr. Gendron faxed a letter to Dr. Friedenthal asking whether he "agreed with [Gendron's] assessment" that Gardner could "work full-time in a sedentary job with only occasional standing or walking." (*Id.* at 417–18.) Gendron asserted that Gardner currently worked "[ten] hours per week as an operating room circulating nurse" and opined that a "sedentary job would likely be less physically demanding than" her current position. (*Id.*)[2] Further, Gendron stated that he "did not find any objective documentation detailing why Ms. Gardner would be unable to perform sedentary levels of activity (sitting 6 to 8 hours per day with only occasional walking) with no lifting greater than 10 pounds." (*Id.*) At the end of the letter were two paragraphs, each with a blank signature line for Dr. Friedenthal, as follows:

> "[1]  I agree that Linda S. Gardner has the capability to perform sedentary work activities for eight hours a day with no lifting greater than 10 pounds, only occasional standing or walking, and sitting 6–8 hours per day.  (She is cur-

rently working 3 hours a day in a vocation that has greater than sedentary work requirements) . . . [or]

> ▬  I do not agree that Linda S. Gardner can work eight hours per day in a sedentary occupation for the following objective reasons."

(*Id.* at 417.)

On March 1, 2004, Dr. Friedenthal examined Gardner and responded to Dr. Gendron's letter.  Dr. Friedenthal's examination note stated:

> "I do not believe that [Gardner] can work as an OR circulator full time.  She could perform sedentary work on a full time basis, but needs accommodation with foot rest because of her extension contracture in the left knee and needs to be allowed to change her position frequently, as sitting for long periods of time tends to bring out cramping of quadriceps muscles.  It is now two years since her replacement and I believe her level of disability will be chronic in nature."

(*Id.* at 427.)  Dr. Friedenthal additionally signed below the first paragraph prepared by Gendron, stating that Gardner could perform full-time sedentary activities.  He added that Gardner "should be allowed to change her position frequently as required.  Need footrest to accommodate knee contracture." (*Id.* at 425–26.)

On March 12, 2004, Unum notified Gardner that it was discontinuing her benefits. The company explained that because its medical consultants were unclear as to why Gardner's work capacity was limited to ten hours per week, it had contacted Dr. Friedenthal, who concluded that, with certain restrictions, Gardner could work in a full-time sedentary position.  The notice

---

**2.**  After her claim was denied, Gardner contended that the information given to Dr. Friedenthal was incorrect.

then listed the following sedentary occupations that Unum's vocational consultant determined would pay Gardner a gainful wage and that would accommodate the restrictions identified by Dr. Friedenthal: bill reviewer, managed health care manager, and insurance case manager. (*Id.* at 441–44.)

Through counsel, Gardner appealed administratively from Unum's denial. In support of her claim, Gardner referred to various medical records and reports, a letter describing her pain and limitations in daily activities, articles describing AVN, and a letter from an insurance company advising that she did not receive a case management position for which she had interviewed. Gardner clarified that she worked in a colonoscopy facility, not as an operating room nurse as Gendron's letter to Dr. Friedenthal had stated. She advised Unum that Gendron's letter incorrectly described her job's requirements as well as the hours that she worked and had irrevocably damaged her relationship with Dr. Friedenthal. She also submitted a vocational expert report from Charles A. Kincaid, Ph.D., who concluded that she could not earn a gainful wage.

Unum sought review of Gardner's file by another consultant—nurse Richard Cole. Cole submitted a report concluding, among other things, that Dr. Friedenthal's March 2004 restrictions "appear reasonable, except that the claimant may not be able to tolerate full time sedentary due to her pain level." (*Id.* at 800.) He also surmised that Gardner's capacity for prolonged sedentary activity was unclear but that she indicated that such activity was "significantly impacted due to pain that is best controlled with rest and elevation. Her reported impact pain has had on her life, again, would be reasonable and will likely

not change for the better. She tolerates work to at least a sedentary level on a very sporadic basis, and it is not clear she would be able to tolerate more than that." (*Id.* at 799–800.)

After receiving Cole's report, Unum sent Gardner's file to Dr. George Seiters for review. (*Id.* at 801.) He agreed with Cole's summary of the orthopedic information, but determined that the clinical findings were "consistent with a degree of knee pathology that could be reasonably treated by limited weight bearing and frequent repositioning and should not be aggravated or made significantly symptomatic by sedentary activities." (*Id.* at 815.) He thus concluded that it was reasonable for Gardner to work full-time in a sedentary capacity with the restrictions recommended by Dr. Friedenthal. (*Id.* at 814–17.)

On September 27, 2004, Unum notified Gardner that it was upholding the decision to deny her claim for disability benefits. (*Id.* at 819–21.) The notification report stated that "[o]ur medical consultant concludes that the medical documentation is consistent with the restrictions and limitations stated by Dr. Friedenthal ... for sedentary capacity...." (*Id.* at 820.) Unum then informed Gardner that an updated vocational assessment had concluded that she could earn a gainful wage in the following occupations: bill reviewer, insurance case manager, managed health care manager, and telephonic triage nurse. (*Id.* at 821.)

Thereafter, Gardner filed an action through counsel[3] in the United States District Court for the District of New Jersey under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for review of Unum's deni-

---

3. After filing a brief for Gardner in the District Court, her counsel withdrew and she proceeded *pro se.*

al of her long-term disability benefits. The District Court granted Unum's motion for summary judgment and denied Gardner's cross-motion.

Gardner now appeals.

## II.

We have jurisdiction to review the District Court's order under 28 U.S.C. § 1291, and we review *de novo* a court's decision granting summary judgment in an ERISA action. *Smathers v. Multi–Tool, Inc.*, 298 F.3d 191, 194 (3d Cir.2002). "[E]very claim for relief involving an ERISA plan must be analyzed within the framework of ERISA." *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 573 (3d Cir.2006).

The summary judgment standard requires us to resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). Summary judgment is appropriate only if "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The rules are no different when there are cross-motions for summary judgment. *Lawrence*, 527 F.3d at 310.

Unum contends that the abuse of discretion standard applies because the policy gives Unum discretion to determine eligibility for benefits and to construe the policy's terms. *See Metropolitan Life Ins. v. Glenn*, —— U.S. ——, 128 S.Ct. 2343, 2347–2348, 171 L.Ed.2d 299 (2008). However, before that standard is invoked, it is necessary to consider the posture of the litigation. Unum fails to discuss the important fact that the ruling in its favor was not the result of a trial, but of the grant of its motion for summary judgment. Some of the cases cited for application of the arbitrary and capricious standards are judgments entered after a bench trial in favor of the insurance carrier when the scales weighed in favor of affirming factual disputes in favor of the party holding a favorable judgment. However, summary judgments are not granted when factual disagreements exist. Consequently, Unum is not entitled to rely on inferences favorable to itself or disregard challenges of inaccuracy raised by Gardner.[4]

Unum relied heavily on Dr. Friedenthal's March 2004 evaluation, but Gardner asserts that it does not accurately reflect his medical opinion as to her functional abilities because it was based on false information about her job duties and the hours that she worked as stated in Dr. Gendron's letter. Unum argues that the March 2004 evaluation constituted substantial evidence supporting its decision because Dr. Friedenthal examined Gardner the same day that he responded to Gendron's letter. Moreover, Unum discounts Gardner's assertion that the letter's misinformation damaged her relationship with Dr. Friedenthal and that Dr. Friedenthal did not, in fact, conduct an adequate physical examination before responding to Gendron. To resolve the inconsistency requires a weighing of the evidence to determine "the truth of the matter." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Moreover, Gardner's assertion about the unreliability of Dr. Friedenthal's March 2004 evaluation is supported by the fact

---

4. Judicial review of an administrative decision is generally limited to the evidence presented to the administrator, *see Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir.1997), but charges of fraud or mistake in the record are subject to scrutiny.

In this case, we discuss only material submitted to the District Court which apparently accepted Gardner's *pro se* submissions as declarations. We approve that procedure in this case.

that it is so inconsistent with the detailed reports supplied by him throughout the years, and as such it can best be described as aberrant. Viewing the record in Gardner's favor, there is a serious question as to whether it may have been improper for Unum to seize upon it to deny Gardner's claim. *See Glenn v. MetLife,* 461 F.3d 660, 672 n. 4 (6th Cir.2006), *aff'd Metropolitan Life Ins. Co. v. Glenn,* —— U.S. ——, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008).

In addition, there is a conflict as to the extent of Gardner's part-time job activities. Unum contends that in a telephone conversation, she stated that at her job, "[s]he is busy running around to set up the operating room ... [and that] she is able to sit at least half of the time." (SA at 240.) Gardner submitted an affidavit to the District Court asserting that she never described her job in this way.

Gardner also disputes that she was qualified for the jobs identified by Unum's vocational consultants and argues that they did not engage in a competent evaluation. She contends that Unum determined that she was qualified for any job "within the nursing field" without considering how her skills and experience correspond to those required to perform the duties of a case manager, bill reviewer, or other jobs identified by Unum's vocational consultants. Unum, on the other hand, asserts that its consultants considered all of the medical evidence as well as Gardner's experience and background to conclude that she was qualified for the identified occupations.

The policy requires that the claimant be unable to perform the duties of "any gainful occupation" for which she is reasonably fitted by education, training, or experience. Unum was under a duty to make a reasonable inquiry into the types of skills Gardner possesses, and whether they transfer to another job in which she can be gainfully employed as defined by the policy. The record sheds little light on the depth of Unum's vocational analyses, and Gardner has identified a dispute as to whether she possesses the qualifications to perform the tasks required by the occupations identified by Unum's vocational consultants.

In considering the arbitrary and capricious aspect of the case, the District Court determined that Unum operated under a conflict of interest because of its position as the plan administrator and the payor of benefits. *See Glenn,* 128 S.Ct. at 2348. This is one factor that is examined in determining if an administrator abused its discretion by denying benefits. *Id.* at 2350. In *Glenn,* the Supreme Court explained that "the conflict of interest ... should prove more important (perhaps of great importance) ... [in] cases where an insurance company has a history of biased claims administration." *Id.* at 2351. As an example of such an insurance company, the Supreme Court cited a law review article detailing the history of biased claims review by Unum. *Id.* The Court of Appeals for the Second Circuit also stated that "First Unum is no stranger to the courts, where its conduct has drawn biting criticism from judges." *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 137 (2d Cir.2008) (citing *Radford Trust v. First Unum Life Ins. Co.,* 321 F.Supp.2d 226, 247 (D.Mass.2004), *rev'd on other grounds,* 491 F.3d 21, 25 (1st Cir.2007)). Unum's "history of deception and abusive tactics [can be] evidence that it was influenced by its conflict of interest as both plan administrator and payor." *See id.*

Another matter considered in *Glenn* is whether the insurer/administrator emphasized "certain medical reports that favored a denial of benefits, [and ignored] certain other reports that suggested a contrary conclusion." *Glenn,* 128 S.Ct. at 2352; *see McCauley,* 551 F.3d at 136–37.

In terminating benefits, Unum relied upon Dr. Friedenthal's March 1, 2004 evaluation and on Dr. Seiters's report, both of which suggested that Gardner was ineligible. However, Unum disregarded the well-reasoned opinions of two of its own consultants favoring the continuation of payments. Further, until it received the March 2004 communication from Dr. Friedenthal, Unum had persistently failed to credit his opinion about Gardner's work capacity.

The District Court was confronted with the difficulties inherent in a *pro se* presentation of a complicated case and is entitled to commendation for the thorough and patient manner in which the litigation was treated. The able judge was well aware of the two standards of review and how they sometimes mesh in a certain circumstances. In some parts of the comprehensive opinion, the lines between the two standards became blurred and resulted in an unwitting evaluation of the record in favor of Unum. Left undetermined were a number of issues that require investigation, amplification, and explanation. Whether Unum's denial of benefits will prove to be arbitrary and capricious is not before us at this point. The issue is not ripe for a ruling, and we need not discuss the law applicable to that issue which is applicable under uncontested facts.

We have treated this appeal with due regard for Gardner's *pro se* status. However, if she wishes to continue with this complicated case, we strongly suggest that she retain a lawyer to represent her.

Because the summary judgment was inappropriate, it will be vacated. Among other measures on remand, the District Court may wish to consider remanding to Unum, *see Smathers v. Multi–Tool, Inc.,* 298 F.3d 191, 200 (3d Cir.2002), or having further discovery or a trial on the merits.

The judgment will be vacated and the case remanded for further proceedings.