Joel E. **HIRSH**

v.

**BOEING HEALTH AND WELFARE BENEFIT PLAN, a/k/a the Boeing Traditional Medical Plan, and Boeing Employee Benefits Plan Committee.**

Civil Action No. 09–CV–3120.

United States District Court,
E.D. Pennsylvania.

June 14, 2010.

Thomas D. Schneider, Wallingford, PA, Joseph M. Fioravanti, Media, PA, for Joel E. Hirsh.

Kimberly J. Gost, Nina Markey, Littler Mendelson, PC, Philadelphia, PA, for Boeing Health And Welfare Benefit Plan, a/k/a the Boeing Traditional Medical Plan, and Boeing Employee Benefits Plan Committee.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

This action is now pending before this Court for resolution of the parties' cross-motions for summary judgment. For the reasons outlined in the paragraphs which

follow, the motions shall be granted in part and denied in part.

### Background Facts

Plaintiff Joel Hirsh is an employee of the Boeing Company and, as such, he and his family have health care coverage under the Boeing Health and Welfare Plan, otherwise known as the Boeing Traditional Medical Plan (hereinafter "Plan"). Since he was a small child, Mr. Hirsh's son Alexander ("Alex") has required psychiatric and/or mental health treatment.[1] In 2006 when he was 15 years old, Alex Hirsh began receiving that treatment on an inpatient basis, at a number of different facilities.[2]

On or about March 7, 2007, Alex entered in-patient treatment at Innercept Academy, located in Coer D'Alene, Idaho. With the exception of several brief visits home to Wynnewood, Pennsylvania, Alex remained at Innercept until April 19, 2008, when his parents transferred him to the King George School ("KGS"), a therapeutic boarding school in Vermont. Alex apparently received in-patient treatment at the King George School until sometime in April 2009. Despite Plaintiff's repeated submissions of bills and doctor's reports, and appeals for payment of Alex's in-patient expenses from Innercept and KGS, the defendants have refused coverage and/or reimbursement for any of Alex's treatment at KGS and have refused to pay anything more than $13,753 for the care which he received at Innercept.[3]

On July 13, 2009, Plaintiff commenced this lawsuit pursuant to Section 502 of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 ("ERISA") seeking to recover the full amount of benefits due under the Plan, together with counsel fees,

---

1. More recently, Alex has been diagnosed as suffering from, *inter* alia, major depressive disorder with psychotic features, anxiety disorder with obsessive thoughts and polysubstance dependence, as well as a variety of learning disorders. As of November, 2007, he also demonstrated a "[p]ersistent danger of self harm/suicide, delusional impairment in reality testing, compulsive need to self medicate with illegal substances, inability to regulate personal hygiene and the danger of self injurious behavior or elopement." (AR0060–AR0062).

2. Indeed, the Administrative Record reflects that between June 22, 2006 and August 8, 2006, Alex Hirsh was placed in the wilderness program at Three Rivers Montana in Belgrade, Montana. On or about August 9, 2006, Alex was transferred to Logan River Academy in Logan, Utah where he remained through November 8, 2006. The plaintiff and his wife paid slightly more than $20,000 to Three Rivers Montana for Alex's participation in the wilderness program, none of which was reimbursed by the plan. Although Alex was eventually asked to leave the Logan River Academy, Mr. Hirsh's insurance did pay for his treatment and stay there. Immediately after his removal from Logan River, Alex was admitted to the Northern Idaho Behavior Health ("NIBH") facility in Coeur d'Alene, Idaho. NIBH charged about $28,000 per month but it was a contracted "in-network" provider under the plan and thus most of the NIBH bill was paid by the plan. Alex was transferred from NIBH to Innercept Academy on March 7, 2007, primarily because two of his treating therapists from NIBH were on staff there and because it was academically accredited which would enable Alex to complete 10th grade there. (AR0647–AR0682). As noted, aside from a few visits home to Pennsylvania, Alex remained at Innercept until April, 2008 when he transferred to the King George School in Vermont. He stayed at King George for approximately one year through April, 2009.

3. According to the complaint in this matter, Innercept billed Mr. Hirsh approximately $38,000 for Alex's treatment between March 7, and June 30, 2007, and $85,000 for the care he received between July 10, 2007 and April 19, 2008. (Pl's Complaint, ¶s 11–12, 17). The complaint further avers that Mr. Hirsh paid the King George School some $91,400 for the services which it provided to Alex in the one-year period between April 2008 and April 2009. (Complaint, ¶ 24).

interest, and costs of suit. In reliance on the administrative record, both parties now move for the entry of judgment in their favor pursuant to Fed.R.Civ.P. 56.

### Standards Governing Summary Judgment Motions

Fed.R.Civ.P. 56(c)(2) dictates the general standard for determining motions for summary judgment:

> "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir.2006), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The summary judgment standard requires us to resolve all ambiguities and to view all facts and draw all factual inferences in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gardner v. Unum Life Insurance Co. of America*, 354 Fed. Appx. 642, 648 (3d Cir.2009); *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir.2008). Under Fed.R.Civ.P. 56(a) and (b), a summary judgment motion may be filed by either the party claiming relief or the defending party and the same principles apply when there are cross-motions for summary judgment. *See, Lawrence, supra.*

### Discussion

Congress enacted ERISA to "protect ... the interests of participants in employee benefit plans and their beneficiaries" by setting out substantive regulatory requirements for employee benefit plans [4] and to "provide for appropriate remedies, sanctions and ready access to the Federal courts." *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208, 124 S.Ct. 2488, 2495, 159 L.Ed.2d 312 (2004) quoting 29 U.S.C. § 1001. The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. *Id.*

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Barinova v. ING*, 363 Fed.Appx. 910, 913 (3d Cir.2010), quoting *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299, 305 (2008). To this end, Section 502(a)(1)(B) provides the following, in relevant part:

(a) **Persons empowered to bring a civil action**

A civil action may be brought—

(1) by a participant or beneficiary—

. . . .

---

4. Under 29 U.S.C. § 1002(1),

[t]he terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical or hospital care or benefits or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

29 U.S.C. § 1132(a)(1)(B).

██ Such claims may be brought against an ERISA plan itself or against the persons who are shown to have control over the plan in their fiduciary capacity. *Rieser v. Standard Life Insurance Company,* Civ. A. No. 03–5040, 2004 WL 1427131 at *5, 2004 U.S. Dist. LEXIS 11556 at *16 (E.D.Pa. June 24, 2004), citing *Curcio v. Hancock Mutual Life Insurance Co.,* 33 F.3d 226, 233 (3d Cir.1994). A plaintiff seeking to recover under Section 502(a)(1)(B) must demonstrate that the benefits are "actually due," that is, he or she must have a right to benefits that is legally enforceable against the plan. *Hooven v. Exxon Mobil Corp.,* 465 F.3d 566, 574 (3d Cir.2006). However, the ERISA statute itself fails to state the appropriate standard of review to be applied in actions challenging benefits denials under Section 502(a)(1) and it has therefore been left to the courts to carve out the appropriate standards. In so doing, the Supreme Court looked to trust law for guidance, recognizing that the proper standard of review of a trustee's decision depends on the language of the instrument creating the trust. *Conkright v. Frommert,* —— U.S. ——, 130 S.Ct. 1640, 176 L.Ed.2d 469,

475 (2010). Under trust law, if the trust documents give the trustee power to construe disputed or doubtful terms, the trustee's interpretation will not be disturbed if reasonable. *Id.*

██ Based on these considerations, the Supreme Court decreed that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.,* quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). When the administrator has this authority, courts apply an arbitrary and capricious standard of review. *Doroshow v. Hartford Life and Accident Insurance Co.,* 574 F.3d 230, 233 (3d Cir.2009); *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993).[5] But if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion. *Firestone,* 489 U.S. at 115, 109 S.Ct. at 957. Such a conflict of interest is created where the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket. *Metropolitan Life Ins. v. Glenn,* 128 S.Ct. at 2346.[6]

---

**5.** At least in the ERISA context, the "arbitrary and capricious" standard of review and the "abuse of discretion" standard are practically identical. *Estate of Schwing v. The Lilly Health Plan,* 562 F.3d 522, 526, n. 2 (3d Cir.2009). Under these standards, a reviewing court may overturn an administrator's decision to deny benefits "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Orr v. Metro Life Insurance Co.,* Civ. A. No. 1:CV–04–557, 2007 WL 2702929 at *11, 2007 U.S.

Dist. LEXIS 67855 at *31–*32 (M.D.Pa. Sept. 13, 2007), quoting *Abnathya, supra.*

**6.** Indeed, in the *Firestone* and *Glenn* cases, the Supreme Court outlined the following four relevant principles for reviewing benefits determinations made by fiduciaries and/or plan administrators:

(1) In "determining the appropriate standard of review," a court should be "guided by principles of trust law;" in doing so, it should analogize a plan administrator to

 ERISA's framework also ensures that employee benefit plans be governed by written documents and summary plan descriptions, which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits. *In re Lucent Death Benefits ERISA Litigation,* 541 F.3d 250, 254 (3d Cir.2008), quoting *In re Unisys Corp. Retiree Medical Benefit ERISA Litigation,* 58 F.3d 896, 902 (3d Cir.1995). It is therefore incumbent upon the courts to look to the plan documents to interpret plan obligations. *In re Lucent,* 541 F.3d at 254. The written terms of a plan control and employers may not modify or supercede them orally. *Gardner, supra; In re Lucent,* 541 F.3d at 255. When a plan is clear and unambiguous, a court must determine its meaning as a matter of law without looking to extrinsic evidence. *In re Lucent, id.,* citing *International Union v. Skinner Engine Co.,* 188 F.3d 130, 138, 145 (3d Cir.1999). Likewise in considering a claim, a court may not substitute its own judgment for that of the plan administrator. *Stratton v. E.I. DuPont de Nemours & Co.,* 363 F.3d 250, 256 (3d Cir.2004). That is, the court's review should be based on the record available to the plan administrator and should not represent the court's independent judgment of the claimant's disability. *Orr v. Metro Life Ins. Co.,* 2007 WL 2702929 at *11, 2007 U.S. Dist. LEXIS 67855 at *32 citing *Kosiba v. Merck & Co.,*

384 F.3d 58, 69 (3d Cir.2004). *See also, Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 440 (3d Cir.1997); *Magera v. Lincoln National Life Insurance Co.,* No. 3:08–CV–565, 2009 WL 260993 at *2, 2009 U.S. Dist. LEXIS 7871 at *4 (M.D.Pa. Feb. 4, 2009). Where a court is applying "the arbitrary and capricious standard of review, the 'whole' record consists of that evidence that was before the administrator when he made the decision being reviewed." *Magera, id.,* quoting *Mitchell v. Eastman Kodak,* 113 F.3d at 440.

 As is clearly stated in the plan documents in this case, the Plan Sponsor of the plaintiff's medical benefits plan is the Boeing Company and the Plan Administrator is the Employee Benefits Plans Committee ("EBPC"). The EBPC may be reached and contacted at the same address as the Boeing Company. (AR0434, AR0529, AR0969). The plan documents further state:

> As Plan Administrator, the EBPC has authority over administration of the Plan and has all powers necessary to enable it to carry out its duties as Plan Administrator, such as determining questions of eligibility and benefit entitlement. The Plan Administrator has authority to make these determinations in its sole discretion. The Plan Administrator's decision upon all such matters is final and binding.

> The Plan Administrator also has been delegated authority by the Board of Di-

---

the trustee of a common-law trust; and it should consider a benefit determination to be a fiduciary act (*i.e.,* an act in which the administrator owes a special duty of loyalty to the plan beneficiaries).

(2) Principles of trust law require courts to review a denial of plan benefits "under a *de novo* standard" unless the plan provides to the contrary.

(3) Where the plan provides to the contrary by granting "the administrator" or fiduciary *discretionary authority* to determine eligi-

bility for benefits, trust principles make a *deferential standard* of review appropriate. (4) If a "benefit plan gives discretion to an administrator or fiduciary who is *operating under a conflict of interest* that conflict must be *weighed as a factor* in determining whether there is an abuse of discretion." *Metropolitan Life Insurance Co. v. Glenn,* 128 S.Ct. at 2347–2348 quoting, *inter alia, Aetna Health v. Davila,* 542 U.S. at 218, 124 S.Ct. 2488 and *Firestone,* 489 U.S. at 111–115, 109 S.Ct. 948.

rectors to amend the Plan. The Board of Directors has authority to terminate the Plan.

The Plan Administrator may establish rules and procedures to be followed by participants and beneficiaries in filing applications for benefits and in other matters required to administer the Plan. In addition, the Plan Administrator may

- Prescribe forms for filing benefit claims and for annual and other enrollment materials.
- Receive all applications for benefits and make all determinations of fact necessary to establish the right of the applicant to benefits under the provisions of the Plan, including the amount of such benefits.
- Appoint accountants, attorneys, actuaries, consultants, and other persons (who may be employees of the Company) to advise the Plan Administrator;

also the Plan Administrator may rely upon the opinions of counsel and upon reports furnished by others that it selects.

- Delegate these and other administrative duties and responsibilities to persons or entities of its choice (including delegation to employees of the Company).

. . . . .

(AR0529).[7]

Included in the plan is a Mental Health and Substance Abuse Program which "provides benefits for treatment of mental illness (including eating disorders, such as anorexia nervosa or bulimia) and substance abuse (including abuse of or addiction to alcohol, recreational, or prescription drugs). The program is administered by Value Options." Value Options, which appears to be a health care management/uti-

---

7. The foregoing language is contained in the 2000 Edition of the Plan, and was apparently undisturbed by the various amendments made thereto between 2000 and 2007. The language in the 2008 version of the Plan is similar and likewise vests discretion to determine benefits eligibility in the Plan Administrator:

Notwithstanding any other provision in the Plan, and to the full extent permitted under ERISA and the Internal Revenue Code, the Plan Administrator has the exclusive right, power, and authority, in its sole and absolute discretion, to

- Administer, apply, construe, and interpret the Plan and all related Plan documents.
- Decide all matters and questions arising in connection with entitlement to benefits and the nature, type, form, amount, and duration of benefits.
- Amend the Plan.
- Establish rules and procedures to be followed by participants and beneficiaries in filing applications for benefits and in other matters required to administer the Plan.
- Prescribe forms for filing benefit claims and for annual and other enrollment materials.
- Receive all applications for benefits and make all determinations of fact necessary to establish the right of the applicant to bene-

fits under the provisions of the Plan, including the amount of such benefits.
- Appoint accountants, attorneys, actuaries, consultants, and other persons (who may be employees of the Company) for advice, counsel and reports to make determinations of benefits or eligibility.
- Delegate its administrative duties and responsibilities to persons or entities of its choice such as the Boeing Service Center, the service representatives, and employees of the Company.

All decisions that the Plan Administrator (or any duly authorized designees) makes with respect to any matter arising under the Plan and any other Plan documents are final and binding. If any part of this Plan is held to be invalid, the remaining provisions will continue in force.
(AR0434–AR0435).

Finally, the Boeing Company's Master Welfare Plan effective as of January 1, 2007 likewise contains similar, but not identical language as to the Plan Administrator. (See, e.g., AR0969–AR0974). Because the parties have not specified precisely which version of the Plan was in effect at the time(s) at issue in this action, we have variously referred to and/or quoted from each of them.

lization review company is alternatively described as the "service representative" which "administers the program, maintains the provider network, and operates the Boeing Helpline." (AR0336–AR0337, AR0397, AR0501).[8]

By way of a separate contract, the Boeing Company engaged the services of Regence Blue Shield to provide claims processing, payment and administration services relative to the non-mental health components of the traditional medical plan. (AR0449–AR0452). Under that contract, Regence and Boeing further agreed that Regence Blue Shield "shall finally determine in its discretion whether to pay benefits and cover services, in accordance with the procedures in the Plan." (AR0457).[9] Furthermore, for services to be eligible for reimbursement under the Mental Health Program portion of the plan, the treatment must be determined to be "medically necessary,[10]" and received from any provider contracted with the Boeing Helpline, a licensed psychiatric doctor (M.D.), a licensed clinical psychologist, licensed psychiatric nurse (R.N.) or psychiatric professional at the master's level or above, or from a hospital or treatment facility. If the services are provided by a network provider (*i.e.* one referred by the Boeing Helpline), they will be reimbursed at the rate of 100% after the annual deductible for covered inpatient, partial hospital, or intensive outpatient services; residential treatment may be covered under the plan when it is authorized in place of inpatient care. For non-network providers, the reimbursement rate is only 50% of usual and customary charges after the annual deductible for the covered services of a non-referred provider if the care is certified as covered by the Boeing Helpline. Where the "mental health treatment is related to, accompanies or results from substance abuse, the program will cover only substance abuse treatment." (AR0397–AR0398; AR0501–AR0502).

As is apparent from the preceding language, the plan administrator has discretionary authority to make determinations as to eligibility for and entitlement to benefits. Since the EBPC appears to be part of the Boeing Company itself, we find that the plan administrator likewise appears to

---

8. Again, while the wording used in the 2000 and 2008 versions of the Mental Health and Substance Abuse Program portions of the plan is not identical, the meaning is for all intents and purposes, the same. For this reason, we excerpt portions of the two versions of the plan interchangeably.

9. It is also evident from our review of the Administrative Record that Regence Blue shield was similarly charged with reviewing benefits determinations under the Mental Health and Substance Abuse Program. (*See, e.g.,* AR0685–AR0690).

10. "Medically necessary" means that the treatment, services, or supply meets the following criteria in accordance with the plan and as determined by the service representative. The treatment, service or supply is:
- Required to diagnose or treat the patient's illness, injury, or condition; and the condition cannot be diagnosed or treated without it.
- Consistent with the symptom or diagnosis and the treatment of the condition.
- The most appropriate service or supply that is essential to the patient's needs.
- Appropriate as good medical practice.
- Professionally and broadly accepted as the usual, customary, and effective means of diagnosing or treating the illness, injury, or condition.
- Unable to be provided safely to the patient as an outpatient (for an inpatient service or supply).

A treatment, service, or supply may be medically necessary in part only. The fact that a physician furnishes, prescribes, recommends, or approves a treatment, service, or supply does not, by itself, make it medically necessary. (AR0382).

be operating under a conflict of interest. Thus, while we apply the arbitrary and capricious/abuse of discretion standard of review to the claims in this case, we shall consider the conflict of interest in that application.

The Administrative Record in this matter is voluminous and reflective of the ongoing (and often-unnecessary in this Court's opinion) struggle which Plaintiff was forced to endure with Value Options, the service representative for the Mental Health portion of the defendant plan. To be sure, the record reveals that although it at first refused certification and denied coverage for Alex's initial admission to Innercept, after several months and multiple appeals to Regence Blue Shield, Value Options ("VO") eventually agreed that the treatment which Alex received at Innercept between March 7 and July 10, 2007 was medically necessary and approved coverage.[11] However, notwithstanding its eventual certification of care, VO determined and subsequently Regence Blue Shield upheld the decision that the "usual and customary charge" for the services provided to Alex by Innercept for that period of time was $13,753 per admission. In contrast, Innercept's charges for that time frame equal approximately $40,000. (AR0691). Specifically, the letters from Regence Blue Shield upholding the denial of payments in excess of $13,753 for Alex's admission to Innercept explain that this amount was calculated

"based upon the charge that is most frequently made by providers with similar qualifications for comparable services or supplies within the same geographic area. When determining the profile amounts within a specific area, the Plan utilizes the performing provider's zip code. Services rendered from March 7, 2007 through June 30, 2007 processed to Coeur d'Alene, ID, zip code 83816. In addition, inpatient hospital charges from out of state providers are reimbursed at a flat rate per admission and are not based on the length of stay. The usual and customary amount for Alexander's inpatient hospital admission for these behavior health services, provided within zip code 83816 is $13,753 per admission . . ." (AR0685–AR0688).

Defendants rely upon the following plan language to justify the decision to limit the reimbursement amount for Alex's Innercept admission to the amount referenced above:

**How the Plan Determines the Covered Charge**

This plan pays benefits based on the **covered charges.** A covered charge is the provider's charge for a **covered service** or supply, up to the service representative's maximum allowance. The amount of the covered charge depends on whether you see a network or a **nonnetwork provider.**

● For a **network provider,** the **service representative** determines the amount

---

**11.** It is interesting that Value Options' explanations for the denial of benefits for Alex's admission to Innercept changed no fewer than 7 times. (*See, e.g.,* AR0122–AR0148). Examples of the bases for VO's denials include that Innercept "did not meet [VO's] standards for Residential Treatment Facilities as there is not 24 hour a day licensed staff coverage;" "because Treatment planning is not individualized and/or appropriate to the individual's condition, and/or does not include specific goals and objectives within a

reasonable timeframe," and that VO's review "does not indicate the presence of self-harming behaviors or current aggressive threatening behaviors that would meet criteria for Residential Treatment Setting. An appropriate level of care to the needs of the patient is Outpatient Services," which was later amended to "Partial Hospitalization with Intensive/Structured setting," and still later to "Partial Hospitalization." (*See also,* AR 0073–AR095, AR0329–AR0357, AR0647–AR0682).

of the covered charge for a particular service or supply under any applicable agreement between the service representative and the **provider.**

- For nonnetwork provider, the covered charge is based on the **usual and customary** charge for the covered service or supply. This plan does not cover or otherwise recognize any portion of a provider's charge that exceeds the usual and customary charge; you are responsible for these charges.

**Usual and Customary Charge.** The usual and customary charge is the maximum charge for a covered service or supply the service representative will consider for reimbursement from a nonnetwork provider. The service representative may refer to this as the "maximum reimbursable charge," "maximum allowable charge," "reasonable and customary charge," "allowed amount," or a similar term.

The usual and customary charge is the least of

- The provider's actual charge for the service or supply,
- The provider's normal charge for a similar service or supply, or
- A predetermined percentile (negotiated between each carrier and plan sponsor) of charges made by providers of a comparable service or supply in the geographic area where it is received.

To determine if a charge exceeds the usual and customary charge for medical services or supplies in situations involving unusual or complicated services or supplies, the nature and severity of the injury or sickness may be considered. The service representative uses a database of provider charges to determine the usual and customary charge in an area. Information about the database and percentile used to determine the usual and customary charge can be ob-

tained by contacting the service representative.

If you use a nonnetwork provider, you pay any charges above the usual and customary amount.

**Benefit Maximums**

This plan limits the amount of money that it will pay for certain services and for any one person covered by this plan.

- A benefit maximum limits the amount the plan will pay for a specific **covered service** for a specified period or visit, depending on the service. Once a **participant** reaches a benefit maximum, this plan will not cover that specific service or supply for the rest of the specified period.

 . . .

(AR0381).

Hence, it is clear that the plan does indeed grant authority to the service representative to develop a database to use in determining what the usual and customary charges are for a particular service in a given region. It is also clear from the administrative record that VO and Regence Blue Shield decided to allow only the payment of a flat rate per admission but that they did not apprise the plaintiff or Innercept of this decision until October, 2007. (AR0691–AR074, AR0944). It is **not** clear after an exhaustive review of the administrative record, however, where that database is, how it was developed, how it resulted in the calculation of the figure of $13,753 as being the usual and customary charge for the zip code in question, or whether it was used to determine that this same figure should be used as the benefit maximum for Alex Hirsh's Innercept admission in March, 2007. Plaintiff, on the other hand, produced and submitted to the defendants a report from the University of New Hampshire and the National Association of Therapeutic Schools and Programs (NATSAP) which evinced that the amounts

charged per day by providers like Innercept ranges nationally from a low of $125 to a high of $700, with an average of $318, which is about what Innercept charged for the care which Alex received. (AR0632–AR0646). Thus we find that the decision limiting the expenses for the plaintiff's son's admission and stay at Innercept to the flat rate of $13,753 was unsupported by substantial evidence and without apparent reason. We consequently conclude that this decision constituted an abuse of discretion. *See, Abnathya*, 2 F.3d at 45; *Orr*, 2007 WL 2702929 at *11–12, 2007 U.S. Dist. LEXIS 67855 at *31–*32. Further, inasmuch as there is nothing on this record to refute the reasonableness of this $318 per day rate, we find that for the period between March 7 and July 10, 2007, the plan should have paid the sum of $40,068 for Alex's stay at Innercept. Thus with respect to this decision, we shall grant Plaintiff's motion for summary judgment and direct that the plan reimburse him in the amount of $26,315.[12]

■ We next consider the reasonableness of Value Options' determination that Alex no longer required the level of treatment which Innercept provided after July 10, 2007 and the Plan's refusal to pay for that care after that date. The Innercept records are somewhat scant for this period of time; however, it appears that by June 30, 2007, Alex had begun to make some positive changes in his life and had begun to gain better control of his behavior, at least within the confines of the Innercept environment. (AR0016–AR0023). He was on a home visit from July 6 through July 10, 2007 which reportedly went well, although Alex apparently was irritable and contentious with Innercept staff and had some issues with inappropriate boundaries with a female peer upon his return. (AR085–AR086). The plaintiff and his family were concerned that Alex would not accept boundaries should he be returned home permanently and his doctors were concerned that he would resume his drug use. (AR0087). Despite these concerns, VO found that Alex did not meet its criteria (3.30, *et seq.*) for continuing care in a residential treatment center. Specifically, VO determined and Regence Blue Shield agreed, that Alex satisfied Exclusion Criteria 3 [13] and did not meet Continued Stay Criteria 4 [14] because "[h]e is able to safely be treated in a community setting while living with his family. He is nearly at grade level and has fallen behind since in attendance at the RTC level of care. His return home can include the start of summer school, family therapy, individual therapy and voluntary guidance from the Department of Probation if necessary." (AR0087). The Administrative Record suggests that there was some type of peer to peer review of Alex's records by a Dr.

---

**12.** Because it appears that Mr. Hirsh has already paid Innercept's bill in full, we direct that the plan reimburse him for the difference between the $40,068 charged for the services provided to Alex between March 7 and July 10, 2007 and the $13,753 previously paid.

**13.** Under the Exclusion Criteria for Residential Treatment Center Services (RTS) (Child/Adolescent) 3.301,

*Any of the following criteria is sufficient for exclusion from this level of care:*
. . . .

3. The child/adolescent can be safely maintained and effectively treated at a less intensive level of care.
(AR0333–AR0334).

**14.** Under the Continued Stay Criteria for Residential Treatment Center Services (RTS) (Child/Adolescent) 3.301,
*All of the following criteria are necessary for continuing treatment at this level of care:*
. . . .
4. All services and treatment are carefully structured to achieve optimum results in the most time efficient manner possible consistent with sound clinical practice.

Rao, who presumably reviewed his medical records and spoke with his attending physician, Dr. Ullrich. Nevertheless, it is unclear what information Dr. Rao and/or Value Options relied upon in concluding that Alex could be treated in a "community setting" with "family therapy, individual therapy and voluntary guidance from the Department of Probation if necessary,[15]" or that summer school was even available to Alex. Rather, the notes repeatedly reference Alex's moods as being "labile," "easily frustrated," that he was "intimidating both with staff and peers," and reflect the concern of Dr. Ullrich that Alex would resume his illegal drug use and otherwise relapse if he were discharged too soon. (AR0001–AR0029, AR0087–AR0089). Again, under the arbitrary and capricious standard of review, a reviewing court may overturn an administrator's decision to deny benefits if it is without reason or unsupported by substantial evidence. *See, Estate of Schwing,* 562 F.3d at 526, n. 2. We find this to be the case as to the decision to deny coverage for Alex's Innercept care after July 10, 2007. Given that we cannot discern from the record before us how long after July 10, 2007 [16] Alex may

have continued to require the level of care provided by Innercept, we shall remand this matter to the administrator for re-evaluation of this issue.

■ Finally, we consider whether the refusal to cover Alex's treatment at the King George School ("KGS")in Vermont constituted an abuse of discretion and/or was arbitrary and capricious. In this regard, there is virtually no evidence whatsoever as to what type of treatment and care was available and/or provided to Alex, what his condition was upon admission to or during his stay at the facility or how or if he may have benefitted from the treatment received. It further does not appear from the plan documents that therapeutic boarding schools are recognized as "providers" within the meaning of the plan. Insofar as it is incumbent upon a plaintiff seeking to recover under Section 502(a)(1)(B)to demonstrate that the benefits are "actually due," (*See, e.g., Hooven, supra.*) we find that as to KGS, Mr. Hirsh has failed to satisfy this obligation. Accordingly, we find no abuse of discretion on the part of the plan administrator(s) in denying payment and/or reimbursement

---

**15.** The remark concerning the Department of Probation is particularly puzzling given that there is no evidence that Alex was ever the subject of a juvenile court or other court proceeding or convicted of any crime.

**16.** Indeed, it appears that on or about December 4, 2007, Alex was admitted for inpatient care at a psychiatric hospital due to his reports of hearing voices, suicidal ideation, obsessive, threatening and aggressive behaviors regarding a female peer. He remained there until December 15, 2007 when he was discharged back to Innercept. (AR0092–AR0095). In addition, in late November, 2007, Alex was evaluated by Doris Lebischak, M.D., a psychiatrist in Wayne, Pennsylvania, who diagnosed him as then suffering from, *inter alia,* "Major Depressive Disorder with psychotic features vs. Schizoaffective Disorder # 295.70, depressive type vs. Schizo-

phreniform disorder 295.40, Anxiety Disorder with obsessive thoughts and Polysubstance dependence # 304.8." Dr. Lebischak further opined that:

"Alex's present level of care is inpatient mental health and acute residential treatment facility. Alex needs a specialized program to meet his unique educational and mental health needs. There needs to be control of expressed emotion in the setting with small group instruction, intensive therapeutic supports and AA/NA component with weekly psychiatric intervention and a program that is able to maintain and monitor hygiene and prompt as needed. A closed unit or highly secure unit for safety concerns of suicide, self-injury and assault risks as well as elopement risk continues to be medically necessary."
(AR0060–AR0063).

for Alex's admission and stay at the King George School.

For all of the foregoing reasons, we shall grant in part and deny in part the parties' cross-motions for summary judgment. An appropriate order follows.

## *ORDER*

AND NOW, this 14th day of June, 2010, upon consideration of the Motion for Summary Judgment of Defendants Boeing Health and Welfare Plan and Boeing Employee Benefits Plan Committee (Doc. No. 11) and Plaintiff's Motion for Summary Judgment (Doc. No. 12), it is hereby ORDERED as follows:

1. Plaintiff's Motion is GRANTED IN PART, Judgment is entered in favor of Plaintiff in the amount of $26,315 and this matter is REMANDED to the Plan Administrator(s) for reconsideration of Alex Hirsh's entitlement to benefits for the care and treatment which he received at Innercept after July 10, 2007. In all other respects, the Plaintiff's Motion for Summary Judgment is DENIED.

2. Defendants' Motion is GRANTED IN PART and Judgment is entered in favor of the Defendants as a matter of law as to Plaintiff's claim for benefits for the treatment and care rendered to his son, Alex Hirsh at the King George School in Sutton, VT. In all other respects, the Defendants' Motion for Summary Judgment is DENIED.